IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                        No. 05-CR-1369 BB

MARDOQUEO GONZALES-CALDERON,

      Defendants.

**COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND
ORDER GRANTING SUPPRESSION**

THIS MATTER came before the Court for an evidentiary hearing on August 16, 2005, on Defendant's Motion to Suppress Evidence. The Court has considered the briefs of counsel and the evidence submitted, and now makes the following findings of fact and conclusions of law:

**Findings of Fact**

1.  On or about March 10, 2005, United States Border Patrol Agents Robert E. Moreland and Oscar Duenez were looking for alien smugglers on the Interstate Highway outside Albuquerque, N.M.  They observed a white 1992 GMC Safari minivan traveling east on Interstate 40, west of Albuquerque.

2.  Interstate 40 is a major transcontinental route traveled by multitudes of people each day.

3.  Agent Moreland was parked alongside the freeway in a marked Border Patrol vehicle when he first observed what appeared to be a heavily loaded white Safari.  Defendant was a passenger in the white Safari.

4.      Agent Moreland, an experienced Border Patrol Agent, believed that minivans are a type of vehicle often used to smuggle illegal aliens.  Agent Moreland further testified that heavily loaded vehicles may be carrying illegal aliens.

5.      As the Safari drove past Agent Moreland's vehicle, neither the driver nor the passengers looked at Agent Moreland.  Agent Moreland believed this to be a sign of nervousness.

6.      Agent Moreland began following the Safari, and observed that the Safari bore a temporary license tag. It is Agent Moreland's belief that, while temporary tags are lawful, vehicles bearing temporary license tags sometimes carry illegal aliens.

7.      Agent Moreland also observed the silhouette of heads in the back of the Safari. The heads disappeared from Agent Moreland's view as he followed the Safari. Agent Moreland believed this indicated passengers were hiding from him.

8.      While Agent Moreland was following the Safari, the Safari made two lane changes and varied its speed. Agent Moreland perceived this to be an attempt to evade him.

9.      Agent Moreland then stopped the Safari, and questioned the occupants.

10.     Upon learning that the occupants were Mexican nationals without proper immigration documents, Agent Moreland arrested the driver and the passengers, including Defendant.

11.     The location where the Border Patrol stopped the Safari is approximately 240 air miles from the United States-Mexico border.

12.     When illegal aliens are smuggled into the Phoenix area, they are typically quartered in stash houses. They are then transported to other cities in the United States in more expensive vehicles which are better suited to long distance travel.

13.     It is very unlikely that a vehicle transporting aliens on Interstate 40 through Albuquerque crossed the Mexican border recently.

14.     Neither Agent Moreland nor Agent Knoll had any indication that the Safari had actually crossed the border but Agent Moreland testified he felt he had "articulable suspicion" for the stop.

**Conclusions of Law**

Stop of the Vehicle

1.     The border search is a well established exception to the Fourth Amendment's warrant requirement. See United States v. Venzor-Castillo, 991 F.2d 634, 637 (10th Cir. 1993); United States v. Mayer, 818 F.2d 725, 727 (10th Cir. 1987) (citing Carroll v. United States, 267 U.S. 132, 154).

2.     This exception is based on the sovereign's right to control its international borders. Bradley v. United States, 299 F.3d 197, 201 (3rd Cir. 2002); United States v. Bravo, 295 F.3d 1002, 1006 (9th Cir. 2002).

3.     The Border Patrol's authority to make a stop using reasonable suspicion, instead of probable cause, therefore, "is based upon the hypothesis that the person or object searched has come from outside the country." Venzor-Castillo, 991 F.2d at 638.  See also United States v. Mayer, 818 F.2d 725, 728 (10th Cir. 1987) ("' . . . the sole justification for searches at the functional equivalent of the border is that the border itself has been crossed.'")(quoting United States v. Garcia, 672 F.2d 1349, 1365 (11th Cir. 1982)).

4.     Logic dictates that this standard has geographical parameters and may extend only to the border or its "functional equivalent."  Almeida-Sanchez v. United States, 413 U.S. 266,

272-3 (1973); <u>Mayer</u>, 818 F.2d at 727.  The "functional equivalent" of the border is

legally defined as the first practical point after the border or point of entry wherein a

search may be carried out.  <u>United States v. Sanchez-Luna</u>, 951 F.2d 1261, 1261 (10th

Cir. 1991) (unpublished); <u>Mayer</u>, 818 F.2d at 727.

5.      A search may be approved as an "extended border search" if the following standard is met:

> (1) "a reasonable certainty" or "a high degree of probability" that a border crossing
>
> has occurred; (2) a reasonable certainty that no change in the condition of the
>
> vehicles being inspected has occurred from the time they were loaded at the border
>
> until they were stopped, and that whatever was in the vehicles when they were
>
> searched was in them when they left the border; and (3) a reasonable suspicion that
>
> criminal activity is occurring.

See <u>Yang</u>, 286 F.3d at 947-48 (7th Cir. 2002); <u>United States v. Hyde</u>, 37 F.3d 116, 120 n.2 (3rd

Cir. 1994); <u>United States v. Espinoza-Seanez</u>, 862 F.2d 526, 531 (5th Cir. 1988).

6.      The "reasonable certainty" standard, which governs whether the border patrol may assume

a vehicle crossed the border, requires something more than a showing of probable cause

but something less than proof beyond a reasonable doubt. <u>See</u> <u>Sanchez-Luna</u>, 951 F.2d at

1261; <u>Mayer</u>, 818 F.2d at 728 (quoting <u>United States v. Amuny</u>, 767 F.2d 1113, 1123

(5th Cir. 1985)) (quotations omitted).  <u>See</u> <u>also</u> <u>United States v. Yang</u>, 286 F.3d 940, 947

(7th Cir. 2002) (citing <u>United States v. Cardenas</u>, 9 F.3d 1139, 1148 (5th Cir. 1993));

<u>Espinoza-Seanez</u>, 862 F.2d at 531.

7.      The key question, then, is "whether, under the circumstances of this case, it is reasonable

for [the agent] to have assumed the defendant and his passengers came from the border."

See <u>Venzor-Castillo</u>, 991 F.2d at 638.  In this context, the Tenth Circuit held that the

distance from the border "assumes a critical posture." <u>Id.</u>  The Tenth Circuit has held that

"the standard of reasonable suspicion cannot be used to justify [an] agent's invasive action

. . . [when] the stop did not occur within a reasonable distance from any external boundary

of the United States, and, therefore, was contrary to the authority granted by 8 U.S.C.

§1357(a)(3)."  991 F.2d 634, 640 (10th Cir. 1993). In this case, as in <u>Venzor-Castillo</u>, 1)

the supposed route taken by the defendants ran through a number of towns and cities, 2)

there is an enormous distance from the border to the location of the stop, and 3) the

border patrol Agent "had no idea at all" where the defendant entered the road.  <u>See id.</u> at

638.   The enormity of the distance from the border in this case, therefore, also counsels

against a finding of reasonable certainty that the Defendant's vehicle actually crossed the

border.

8.      Furthermore, in this case, the Agents testified that they had no information, either direct or

indirect, that would lead them to believe that the Defendant's vehicle actually crossed the

border.  Because "[c]ourts have declined to find the reasonable certainty standard has been

satisfied where there was no monitoring of a border crossing and where there was no

independent evidence that a border crossing had occurred," this Court finds that the

agents lacked a reasonable certainty that the vehicle had actually crossed the border. <u>See</u>

<u>Mayer</u>, 818 F.2d at 729; <u>cf.</u> <u>Sanchez-Luna</u>, 951 F.2d at 1261 (finding a "reasonable

certainty" that Defendant crossed the border where there was strong circumstantial

evidence, corroborated by independent corroboration of a witness, that Defendant had

crossed the border).

9.      The scenario that the agents believed they observed -- that several people of Hispanic ancestry were in a van with temporary license plates some 240 miles from the border – is not sufficient to establish a reasonable certainty that the Defendant had crossed the border.[1]

10.     Because the Agents lacked a reasonable certainty that the Defendant actually crossed the border, the stop cannot be justified as any kind of border search. Because the stop cannot be justified under the border exception to the Fourth Amendment, probable cause --  not merely reasonable suspicion -- was required to stop the vehicle.  See Venzor-Castillo, 991 F.2d at 638 (noting that the ability to use reasonable suspicion "instead of probable cause" is based on a belief that the vehicle crossed the border).

11.     The Government does not argue that probable cause existed prior to the stop, and the Court accordingly finds that there was no probable cause to support the stop of Defendant's vehicle.

Suppressibility of Defendant's Identity

12.     Tangible evidence of the Defendant's identity obtained as a result of the illegal stop and arrest is suppressible evidence, including Defendant's statements regarding his identity and any fingerprints taken from the Defendant during the illegal stop and arrest. See Hayes v. Florida, 470 U.S. 811, 815-16 (1985); United States v. Alvarez-Becerra, 33 Fed. Appx. 403, 409 (10th Cir. 2002) (unpublished) (Briscoe, J., concurring) (citing United States v.

---

[1]The officer's testimony that the van's speed  was erratic and that the van made two lane changes is not relevant as the Agent admitted he had no authority to stop the van for traffic violations.

Guevara-Martinez, 262 F.3d 751, 755-56 (8th Cir. 2001)); see also United States v. Olivares-Rangel, 324 F.Supp.2d 1218, 1224 (D.N.M. 2004).

13.    The Government would not be precluded from proving the identity of the Defendant at a trial, however.  The Supreme Court has held that "[t]he body or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." INS v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984).   Judge Briscoe, in her concurring opinion in Alvarez-Becerra, noted that "[t]he clear import of the Court's statement is that the identity of a defendant is not itself suppressible; that is, the mere fact that a defendant was illegally brought before the court or that his or her identity was learned as the result of an illegal search or arrest does not mean that the government will not be allowed to prove the defendant's identity."  Alvarez-Becerra, 33 Fed. Appx. at 409 (Briscoe J., concurring); see also United States v. Roque-Villanueva, 175 F.3d 345, 346 (5th Cir.1999); United States v. Guzman-Bruno, 27 F.3d 420, 421-22 (9th Cir.1994). Thus, the Government may seek to prove the Defendant's identity at a trial through some other intangible evidence, as by the examination of a witness that might recognize the Defendant.

14.    The Government bears the burden to show that the taint of the violation was purged such that any statements or evidence would be admissible. Taylor v. Alabama, 457 U.S. 687, 690 (1982).  However, the Government has not argued that there were any intervening events that would save the evidence obtained from the illegal stop and arrest from

suppression.  Thus, this Court finds that the Government has not met its burden to show that the statements and evidence are admissible.

## Order

WHEREFORE,  IT IS HEREBY ORDERED that Defendant's Motion to Suppress (Doc. 10) is GRANTED.

Dated at Albuquerque this 16th day of September, 2005.

BRUCE D. BLACK
United States District Judge